**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **NANCY MARCUM, on behalf of herself and her minor daughter, C.V.,** | : | |
| | : | **Case No. 2:08-cv-909** |
| **Plaintiffs,** | : | |
| | : | **Judge Holschuh** |
| **v.** | : | |
| | : | **Magistrate Judge Abel** |
| **BOARD OF EDUCATION OF BLOOM-CARROLL LOCAL SCHOOL DISTRICT, et al.,** | : | |
| | : | |
| **Defendants.** | | |

**<u>MEMORANDUM OPINION & ORDER</u>**

After Plaintiff C.V. was expelled from Bloom-Carroll Middle School, her mother, Nancy Marcum, filed suit on behalf of herself and C.V. against the Board of Education of Bloom-Carroll Local School District ("Board of Education") and Bloom-Carroll Middle School Principal Mark Fenik, seeking relief under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and 42 U.S.C. § 1983.  This matter is currently before the Court on motions for summary judgment filed by those defendants.  (Docs. 36, 37).

## I.     Background and Procedural History

At the time the events giving rise to this lawsuit took place, C.V. was 12 years old and was a 7th grader at Bloom-Carroll Middle School.  The middle school and high school were on the same campus but in separate buildings.  Students from the two schools shared the same school buses. Rosemary Costello was a high school student assigned to sit at the back of Bus 16.  After school on the afternoon of September 27, 2006, as she was exiting the bus, Costello told bus driver Pam Seymour that she had just observed C.V. engaging in oral sex with Ryan Gueli, a 17-year old high school student, in the back seat of the school bus.  (Costello Dep. at 35).  C.V. and Gueli were

friends and, on one occasion earlier that summer, had engaged in sexual intercourse at C.V.'s house.[1]

When Seymour finished her bus route that afternoon, she told her supervisor, Steve Kennedy, of Costello's allegations.  Early the next morning, Kennedy notified Roger Mace, the principal at Bloom-Carroll High School, and Mace contacted Mark Fenik, the principal at Bloom-Carroll Middle School.  (Mace Dep. at 108).  Mace, Fenik, and Jan Wisecarver, the assistant principal at the high school, interviewed Costello who confirmed that she had witnessed C.V. performing oral sex on Gueli.  (Mace Dep. at 111; Fenik Dep. at 64).  They then called Ryan Gueli to the office.  At first he denied that anything had happened, but eventually he admitted that C.V. had performed oral sex on him on the bus the previous afternoon.  (Gueli Dep. at 45-50; Mace Dep. at 115-118; Fenik Dep. at 72, 78).

The administrators then went to the middle school and interviewed C.V.  She eventually admitted to engaging in oral sex with Gueli, but said that he had forced her to do it.  (C.V. Dep. at 109-112, 130; Mace Dep. at 142; Fenik Dep. at 80, 87, 90).  At Fenik's request, C.V. signed a written statement that "I performed oral sex with Ryan on the bus [sic] home from school on 9/27/06."  (Ex. 4 to C.V. Dep.; Fenik Dep. at 92-93).  Mace then went back to the high school and told Gueli that C.V. told them that Gueli had forced her to perform oral sex.  Gueli denied these allegations.  (Mace Dep. at 152).[2]

---

[1]  C.V. contends that Gueli forced himself on her (C.V. Dep. at 84-86); Gueli contends that she consented (Gueli Dep. at 27).  C.V. testified that she did not report the alleged sexual assault because she did not want him to get in trouble.  (C.V. Dep. at 90-92).  Approximately two months after this alleged rape, C.V. wrote Gueli a letter telling him that she loved him.  (C.V. Dep. at 87-90).

[2]  Gueli testified that C.V. voluntarily engaged in oral sex with him.  "She just kind of started to and, well, I let her."  He denies that he forced her to do it.  He testified that when it was over, she looked at him with "a little smirk on her face."  (Gueli Dep. at 39-41).  Rosemary

Mace then called the police, who came to the school to take Gueli's statement.  (Gueli Dep. at 50-51; Mace Dep. at 167).[3]  He also contacted Fairfield County Children's Services.  Fenik and Mace decided to suspend C.V. and Gueli for 10 days for violating the student code of conduct which prohibited inappropriate displays of affection.  (Mace Dep. at 167-68).  They contacted C.V.'s and Gueli's parents and directed them to come to school to pick up their children.  (Mace Dep. at 144, 178-79, 190-92; Fenik Dep. at 96-98; 106-07).[4]

C.V. alleges that during the time she was serving her suspension at home, her fellow students often yelled out the bus windows as the bus drove past her house in the afternoon, calling her a "whore" and a "slut."  After her stepfather called the school to complain, the taunting stopped.  (C.V. Dep. at 207-08).  Following the 10-day suspension, Gueli was moved to a different bus.  (Mace Dep. at 188, 195-96).  C.V. was also required to sit in the front seat of her bus where the bus driver could keep an eye on her.  (Fenik Dep. at 117-19; C.V. Dep. at 147-48).

On Tuesday, October 17, 2006, C.V. returned to school.  She testified that over the course of the next three days, some of her fellow students at school taunted her, calling her names like "whore" and "cum guzzling gutter slut."  Each day, she went to the office, called her mother and asked her to come to school to get her because she was so upset.  Her mother, however, was working and was not able to pick her up.

On the first day, her mother suggested that C.V. report the taunting to Mr. Fenik.  C.V.

Costello also testified that it appeared that C.V. was a willing participant.  (Costello Dep. at 53-54).

[3] Gueli was eventually charged with rape, but pled guilty to a lesser charge.  He served no jail time.  (Gueli Dep. at 53, 56).

[4] After Fenik told C.V.'s parents what had happened on the school bus, C.V.'s mother told him that C.V. had been sexually abused as a child.  (Fenik Dep. at 109).

testified that she talked to Mr. Fenik and gave him the names of students who were harassing her. He allegedly said that he would take care of it.  (C.V. Dep. at 189-94).  C.V.'s mother advised her to "give it a couple of days and see what happens."  (C.V. Dep. at 195).  The taunting allegedly continued on Wednesday and Thursday.  On Wednesday, C.V. again allegedly talked to Mr. Fenik, who again said he would take care of it.  On Thursday, when she reported that she was still being harassed, Fenik allegedly said that he had talked to some of the students, but did not know what else he could do.  C.V. admitted that "he did what he could" and she didn't "know what else he could have done."  (C.V. Dep. at 196-98, 203-05).

Mrs. Marcum testified that she called the school and left voice mail messages after hours on numerous occasions but no one ever called her back.  (Marcum Dep. at 173, 184, 190).  She also testified that she personally talked to Mr. Fenik on three of the four days C.V. was back in school. (Marcum Dep. at 229).

Fenik, however, testified that no one reported to him that C.V. was being harassed by her fellow students, either during her suspension or when she returned to school.  He testified that he first learned of the alleged harassment at the expulsion hearing.  Accordingly, he denies that he investigated the problem or talked to any of the students who were allegedly taunting C.V.  (Fenik Dep. at 125-28).

On Wednesday or Thursday of that week, just after C.V. returned to school following her first suspension, Tiffany Violette reported to Mr. Fenik that her wallet had been stolen and she thought that C.V. had it because another student had seen her with it.  (Fenik Dep. at 147-51).  That same Wednesday, C.V. was given a bathroom pass during 9th period.  While in the hall, she saw her clarinet sitting outside the band room and decided to take it to her locker.  C.V. testified that, on the

4

way to her locker, she noticed an iPod lying on the floor just inside the gym door.  She picked it up, and then noticed Ashley Doss, a high school student who was in the building helping one of the middle school teachers, standing nearby.  C.V. told Ashley that she had found the iPod.  According to C.V., Ashley said that she thought she knew whom it belonged to.  Therefore, instead of turning the iPod into the office, C.V. gave it to Ashley to return to its rightful owner.  Ashley took it home with her.  (C.V. Dep. at 162-71).  The next morning, one of the middle school students reported that her iPod had been stolen during 9th period the previous day.  Fenik polled the teachers to find out which students had been given permission to leave class during that time.  C.V.'s name was on the list.  (Fenik Dep. at 154-55, 198-200).

Ashley Doss returned the iPod to Fenik on Thursday, October 19, 2006.  Because she did not want anyone to get in trouble, she initially said that she had found it at the bus.  Another teacher then convinced her to tell the truth.  So Ashley went back to talk to Mr. Fenik.  She said that she had been in the hallway during 9th period on Wednesday.  C.V. allegedly "asked her if she wanted an iPod. Ashley said sure.  She went in the auditorium, came back out with one and gave it to her."  When Ashley got home that night, she felt guilty, talked to her parents, and decided to return the iPod to school.  (Fenik Dep. at 152, 161-75, 191).  Ashley also told Fenik that C.V. told her that she had taken someone's wallet and a cell phone.  (Fenik Dep. at 170).

On Friday, October 20, 2006, C.V. was called to Mr. Fenik's office.  He set the iPod on his desk and asked her if it looked familiar.  She admitted that she had found it in the auditorium and had given it to Ashley.  (C.V. Dep. at 174-75; Fenik Dep. at 189-90).  C.V. signed a written statement that read, "I took an iPod from the auditorium and gave it to another student on Wednesday 10/18/06."  (Ex. 5 to C.V. Dep.).  C.V. testified that she told Fenik that she gave it to

5

Ashley "to return" to its rightful owner. (C.V. Dep. at 174). Fenik, however, denies that C.V. told him that Ashley knew who owned the iPod and offered to return it. (Fenik Dep. at 190-91).

In addition to admitting that she had given the iPod to Ashley, C.V. also admitted to Fenik that she had Tiffany Violette's wallet at home. (Fenik Dep. at 185). C.V. maintains that her friend, Erica, had given it to her to return to Tiffany. When C.V. did not see Tiffany at school, she took the wallet home with her, intending to return it the next day. (C.V. Dep. at 46-47).[5]

Mr. Fenik suspended C.V. from school for another 10 days for stealing the iPod and lying to administrators. Based on these infractions and previous disciplinary situations, he recommended that she be expelled. (Ex. 26 to Fenik Dep.). Mrs. Marcum testified that when she challenged him about his investigation into the alleged theft of the iPod, "he smirked, pushed his seat back and said, well, she's getting – I usually always get what I want. I'm going for expulsion." (Marcum Dep. at 276).

An expulsion hearing was held on October 27, 2006. Interim Superintendent Lynn Dildine presided over the hearing. C.V. was then expelled from Bloom-Carroll Middle School for theft of the iPod, disruption of the educational process, and lying to administrators. She did not appeal Dildine's decision. C.V. attended an alternative school for a short period of time. (Fenik Dep. at 206). Although her parents tried to enroll her in adjacent school districts, no other district would accept her. (Marcum Dep. at 323-31). She has been home schooled since that time.

_____

[5] When Fenik called C.V.'s house, C.V.'s stepfather confirmed that Tiffany's wallet was at their house. (Fenik Dep. at 149). When the wallet was eventually returned, $10 was allegedly missing. C.V. denied that she took any money, but her mother nevertheless gave Tiffany $10 to make amends. (C.V. Dep. at 50; Fenik Dep. at 150-51). Fenik admits that he has no proof that C.V. stole the wallet. (Fenik Dep. at 205-06).

On September 25, 2008, Nancy Marcum filed suit on behalf of herself and C.V.[6]  She alleged that the Board of Education of Bloom-Carroll Local School District and Mark Fenik violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, by failing to take remedial action against Gueli for the alleged sexual assault, and for failing to take meaningful steps to protect C.V. from the ensuing sexual harassment by her fellow students.  Plaintiffs allege that Defendants were deliberately indifferent to C.V.'s rights, and that C.V. was excluded from and denied the benefits of educational programs.  Plaintiffs further allege that, after they complained about the school's failure to take remedial action, Defendants retaliated against them in violation of Title IX  by suspending C.V. and expelling her on a false charge of theft of the iPod.  Plaintiffs also bring claims under 42 U.S.C. § 1983 for a violation of due process, and a violation of free speech and petition rights.  Defendants Board of Education and Mark Fenik have filed separate motions for summary judgment.

## II.    Standard of Review

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter

---

[6]  C.V.'s stepfather, William Marcum, was originally also named as a plaintiff.

7

of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial,
. . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really
have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor
v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also Lansing Dairy, Inc. v. Espy,
39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if
there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir. 1978).
The court's duty is to determine only whether sufficient evidence has been presented to make the
issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of
witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249
(1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that
no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.
Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as
inferences to be drawn from the underlying facts, must be considered in the light most favorable to
the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any
"unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of
fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144,
157-60 (1970).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." <u>Kendall v. Hoover Co.</u>, 751 F.2d 171, 174 (6th Cir. 1984). <u>See also</u> <u>Anderson</u>, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. <u>See also</u> <u>Leary</u>, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." <u>Hall v. Tollett</u>, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party.

9

Anderson, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

## III.    Discussion

### A.    Title IX Claims

Title IX of the Education Amendments of 1972 provides that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ."  20 U.S.C. § 1681(a). Title IX contains an implied private right of action, and damages are available as a remedy.  See Franklin v. Gwinnett County Public Sch., 503 U.S. 60, 65, 76 (1992).  The Supreme Court has held that, under certain circumstances, recipients of federal funds may be held liable under Title IX for student-on-student sexual harassment.  See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 633 (1999).  The Supreme Court has also held that Title IX prohibits retaliation against persons who complain of sex discrimination.  See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005).

In this case, Plaintiffs seek monetary damages under Title IX from the Board of Education and Mark Fenik.  It is undisputed that the Bloom-Carroll Local School District receives federal funding and is bound by Title IX.  Plaintiffs allege that Defendants were deliberately indifferent to student-on-student sexual harassment, and that Defendants retaliated against Plaintiffs for

10

complaining about that harassment.

### 1.　　Claims Against Mark Fenik

In his motion for summary judgment, Mark Fenik argues that he is not subject to personal liability under Title IX because it is undisputed that he is not a recipient of federal funding.  In Fitzgerald v. Barnstable School Committee, 129 S.Ct. 788, 796 (2009), the Supreme Court noted that Title IX "has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."  By not addressing this issue in their response brief, Plaintiffs have impliedly conceded that the Title IX claims against Fenik are not viable.  The Court therefore grants Fenik's motion for summary judgment as to the Title IX claims brought against him in his individual capacity.[7]

### 2.　　Claims Against Board of Education

### a.　　Denial of Educational Opportunities and Benefits

In order to establish a prima facie case of student-on-student sexual harassment under Title IX, a plaintiff must demonstrate that:

> (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,
>
> (2) the funding recipient had actual knowledge of the sexual harassment, and
>
> (3) the funding recipient was deliberately indifferent to the

---

[7]  The Title IX claims brought against Fenik in his official capacity as Principal of Bloom-Carroll Middle School are subsumed in the claims against the Board of Education.  As the Supreme Court noted in Kentucky v. Graham, 473 U.S. 159, 165-66 (1985), a claim brought against a government employee in his *official* capacity is the equivalent of a claim brought against the governmental entity itself.

11

harassment.

Patterson v. Hudson Area Schools, 551 F.3d 438, 444-45 (6th Cir. 2009) (citing Davis, 526 U.S. at 633). Deliberate indifference exists "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648.

The parties agree that the Board of Education cannot be held liable for the alleged sexual assault because there was no reason to believe that Gueli would force C.V. to engage in oral sex on the school bus. Plaintiffs allege, however, that once the Board learned of the alleged assault, it failed in its duty to protect C.V. from further contact with Gueli. (Am. Compl. ¶¶ 14, 17, 32). Plaintiffs also allege that the Board failed to take any meaningful steps to protect C.V. from the taunting she experienced from fellow students. (Am. Compl. ¶¶ 18-21, 32).

In its motion for summary judgment, the Board of Education focuses solely on the allegations concerning its response to taunting by fellow students. Before turning to these allegations, a brief discussion of the Board's alleged failure to take appropriate action to protect C.V. from further contact with Gueli is warranted.

(i)      **Failure to Protect C.V. From Further Contact With Gueli**

The Court recognizes that the parties dispute whether Gueli forced C.V. to perform oral sex on him but, for purposes of the pending motion, the Court must view the evidence in the light most favorable to Plaintiffs. Clearly, a sexual assault constitutes one of the most severe forms of sexual harassment imaginable and has the potential to be so traumatic that the victim is effectively denied equal access to the educational opportunities or benefits provided by the school. See Soper v. Hoben, 195 F.3d 845, 855 (6th Cir. 1999). It is undisputed that Defendants had actual knowledge of the alleged sexual assault. Nevertheless, based on the evidence presented, no reasonable jury

12

could find that Defendants were deliberately indifferent in taking action to protect C.V. from further contact with Gueli.

Like C.V., Gueli was suspended from school for 10 days. Because he and C.V. attended different schools, there was little or no chance that she would run into him during the school day.[8] The record shows that Defendants took immediate steps to move Gueli to a different school bus so that C.V. would not have any further contact with him. In addition, C.V. was ordered to sit in the front seat of the bus. (Mace Dep. at 188, 195-96; Fenik Dep. at 117-19). Gueli testified that he never saw C.V. again after September 27, 2006. (Gueli Dep. at 62).

C.V. testified that she remembered seeing Gueli sitting at the back of her bus one afternoon after she returned to school following her suspension. However, she also admitted that her memory may be flawed. (C.V. Dep. at 149, 154-55). Likewise, although Pam Seymour initially testified that she saw Gueli on her bus one time after the 10-day suspension, she later admitted that she may have mistaken his brother for him since they look alike. (Seymour Dep. at 21, 32-33).

In the Court's view, this conflicting testimony does not create a genuine issue of material fact. Even if Gueli did board C.V.'s bus on that one occasion, the record clearly shows that Defendants took appropriate steps to ensure that Gueli and C.V. would not have any further contact with each other on the school bus. Under the circumstances presented here, no reasonable jury could find that Defendants were deliberately indifferent or failed to take appropriate action to protect C.V. from further contact with Gueli. Defendants' response was not "clearly unreasonable in light of the known circumstances," as is required for a finding of deliberate indifference. See Davis, 526 U.S.

---

[8] For this reason, this case is factually distinguishable from Doe v. Derby Bd. of Educ., 451 F.Supp.2d 438 (D. Conn. 2006), a case cited by Plaintiffs.

at 648.

### (ii)     Failure to Take Steps to Stop Taunting and Name-Calling

The Court turns now to Plaintiffs' claim that Defendants were deliberately indifferent to the taunting C.V. allegedly endured at the hands of her fellow students following the incident on the school bus.  Defendants concede that there are genuine issues of material fact concerning whether any of the administrators had actual knowledge of the alleged sexual harassment.  They argue, however, that, based on the evidence presented, no reasonable jury could find that the alleged harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived C.V. of access to educational opportunities.  They also argue that no reasonable jury could find that the school district was deliberately indifferent.

In determining whether the alleged harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived C.V. of access to the educational opportunities provided by the school, the Court looks to the nature, frequency, and duration of the harassment, as well as its effect on the victim.  Defendants note that the only harassment alleged by C.V., other than the alleged sexual assault itself, involves name-calling by some of her fellow students.  As the Supreme Court noted in <u>Davis</u>,

> Courts . . .must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. . . . in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender.  Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

14

526 U.S. at 651-52.

The sexual harassment in this case simply does not rise to that level.  Viewing the evidence in the light most favorable to Plaintiffs, it appears that while C.V. was serving her first 10-day suspension, some students yelled obscenities out the bus windows on a few occasions as the bus passed her house.  After her stepfather complained to someone at the school district, that taunting stopped.  (C.V. Dep. at 206-08).  Following that suspension, C.V. was only in school for a few days before being suspended again, and ultimately expelled, for the alleged theft of the iPod.  She testified that during the 3 or 4 days that she was back in school, a few kids called her vulgar names.  (C.V. Dep. at 188-189, 197).  This alleged verbal harassment, which began when C.V. was suspended on September 28, 2006 and ended no later than October 20, 2006 when C.V. was suspended a second time, lasted a total of just over three weeks, and was intermittent.

Understandably, C.V. was upset by the cruel comments of her classmates.  She testified that on each of the 3 days she was in school following the first suspension, she called her mom, crying, and asked to be picked up.  Because her mother was unable to comply with C.V.'s request, C.V. remained at school until the end of each school day.  As Defendants note, there is no evidence that the taunting so undermined and detracted from her educational experience that she was effectively denied equal access to educational opportunities or benefits.  See Davis, 526 U.S. at 651.  There is no evidence that C.V. refused to go to school, skipped classes, or withdrew from extra-curricular activities in order to avoid the students who were allegedly taunting her.  Nor is there any evidence that her grades suffered as a result of the alleged harassment.

These facts pale in comparison to the nature, severity, and duration of the sexual harassment found to be actionable in other Title IX cases. See e.g., Davis, 526 U.S. 629 (harassment included verbal abuse and numerous acts of offensive touching, and persisted for a period of more than 5 months, resulting in lower grades and a threat of suicide); Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 253 (6th Cir. 2000) (plaintiff suffered verbal and physical sexual harassment for nearly three years, was diagnosed with depression, and eventually withdrew from school); Patterson, 551 F.3d 438 (6th Cir. 2009) (student who suffered verbal and physical sexual harassment for four years, including a sexual assault, became withdrawn and eventually dropped out of regular classes).

Under the circumstances presented here, the alleged sexual harassment is not sufficiently severe, pervasive or objectively offensive, as a matter of law, to support a claim of denial of educational benefits under Title IX. The Court therefore grants Defendants' motion for summary judgment on Count I of the Amended Complaint. There is no need for the Court to address the issue of whether the Board of Education was deliberately indifferent to the alleged harassment.

### b. Retaliation

In Count 2 of the Amended Complaint, Plaintiffs allege that Defendants retaliated against them in violation of Title IX after Plaintiffs complained about Defendants' failure to take appropriate action to protect C.V. from Gueli and from the sexual taunts of her fellow students. Plaintiffs allege that Defendants retaliated by suspending C.V. and then expelling her for the alleged theft of the iPod.

As noted above, Title IX encompasses claims of retaliation. See Jackson, 544 U.S. at 171. Courts generally look to Title VII caselaw to define Title IX's applicable legal standards. See Nelson v. Christian Bros. Univ., 226 F. App'x 448, 454 (6th Cir. 2007). Absent direct evidence of

16

retaliation, the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), applies.  A plaintiff may establish a prima facie case of retaliation by showing that: (1) she engaged in protected activity; (2) defendant knew that she had engaged in protected activity; (3) plaintiff was subjected to a materially adverse action; and (4) there is a causal connection between the protected activity and the adverse action.  <u>See</u> <u>Harris v. Metropolitan Gov't of Nashville and Davidson County</u>, 594 F.3d 476, 485 (6th Cir. 2010).

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that they have established a prima facie case of retaliation.  C.V. and her mother both testified that they complained to Mr. Fenik on numerous occasions about the peer-on-peer sexual harassment experienced by C.V.  Fenik, however, denies hearing anything about it prior to the date of the expulsion hearing.  (Fenik Aff. ¶¶ 10; 15).  Likewise, Intermim Superintendent Lynn Dildine stated in his affidavit that he had no knowledge of the alleged taunting until the date of the expulsion hearing.  (Dildine Aff. ¶ 10).  Nevertheless, Plaintiffs have presented sufficient evidence to create a genuine issue of material fact on the question of whether Defendants had knowledge of their complaints of sexual harassment.

There is no question that C.V. was subjected to a materially adverse action when she was suspended the second time and then expelled from school.  Because Fenik and Dildine deny that Plaintiffs complained to them about the taunting, they also deny that there is any causal connection between the alleged complaints and the suspension or expulsion.  (Fenik Aff. ¶¶ 15-16; Dildine Aff. ¶¶ 10-11).  But again, for purposes of the pending motion, the Court must view the evidence in the light most favorable to Plaintiffs.

The Sixth Circuit has held:

> Causation can be proven indirectly through circumstantial evidence such as suspicious timing. <u>See</u> <u>Mickey</u>, 516 F.3d at 523, 525.

> Specifically, this Court has found that temporal proximity between
> an assertion of Title VII rights and a materially adverse action, is
> sufficient to establish the causal connection element of a retaliation
> claim "[w]here an adverse employment action occurs very close in
> time after an employer learns of a protected activity." Id. at 525.

Lindsay v. Yates, 578 F.3d 407, 418 (6th Cir. 2009) (citing Mickey v. Zeidler Tool & Die Co., 516

F.3d 516 (6th Cir. 2008)).  In this case, Plaintiffs testified that they complained to Fenik of the

sexual harassment on October 17th, 18th, and 19th.  C.V. was suspended from school on October

20th for the alleged theft of the iPod.  She was expelled from school just one week later.  The

temporal proximity between these events creates an inference that Plaintiffs' complaints motivated

these disciplinary actions.

Because Plaintiffs have established a prima facie case of retaliation, the burden shifts to

Defendants to articulate a legitimate, non-retaliatory reason for C.V.'s suspension and expulsion.

See McDonnell Douglas, 411 U.S. at 802; Harris, 594 F.3d at 485.  Defendants maintain that C.V.

was suspended and expelled because she stole another student's iPod and gave it to Ashley Doss.

(Fenik Aff. ¶¶ 13-14; Dildine Aff. ¶ 11).

Since Defendants have satisfied their burden of production, the burden now shifts back to

Plaintiffs to show that the reason given by Defendants was pretextual. See Harris, 594 F.3d at 485.

Plaintiffs may prove pretext by showing either that: (1) the proffered reason had no basis in fact; (2)

the proffered reason did not actually motivate the suspension and expulsion; or (3) the proffered

reason was insufficient to motivate the suspension and expulsion.  See Manzer v. Diamond

Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

Although C.V. admits that she found the iPod and gave it to Ashley Doss, she denies that she

intended to deny the iPod's rightful owner of its possession.  She maintains that the only reason she

gave it to Ashley instead of turning it into the office was because Ashley knew who owned it and planned to return it to that person.  There is, therefore, some evidence that the proffered reason had no basis in fact.

There is also some evidence that the proffered reason did not actually motivate the suspension and expulsion.  In the Court's view, Plaintiffs have presented sufficient evidence from which a reasonable jury could find that the decision to suspend and expel C.V. was motivated, at least in part, by Plaintiffs' alleged complaints about the alleged sexual harassment.

Mrs. Marcum testified that when she called Mr. Fenik the second time to complain about the taunting, he was "very short" and she had the impression that he "was really getting tired of me calling."  She further testified that the third time she called, "I really P'd him off" and he was "right down [sic] rude."  (Marcum Dep. at 349-50).  When Mrs. Marcum came to the school to pick C.V. up on October 20th, following the second suspension, Mr. Fenik was "laughing in my face" and was "hateful."  (Marcum Dep. at 352).  He allegedly smirked, told her that he usually got what he wanted, and he was going for expulsion.  (Marcum Dep. at 276).

Moreover, Fenik admitted in his deposition that Ashley's credibility was "questionable," based on the fact she initially stated that she had found the iPod at the bus, but then later implicated C.V. not only in the theft of the iPod but also in the theft of a wallet and a cell phone.  It appeared to Fenik that Ashley may have been trying to deflect attention from her own wrongdoing, *i.e.*, taking another student's iPod off school property.  (Fenik Dep. at 178-79).  Nevertheless, Fenik chose to believe Ashley over C.V.  He got the impression from talking to another teacher that Ashley had been through some tough times and was trying to turn her life around and do the right thing.  He admitted that he did not inquire any further about Ashley's background, and that he "probably

19

should have investigated more, but didn't." (Fenik Dep. at 180-81).

Based on the evidence presented, a jury could reasonably find that the reason given for the disciplinary action taken against C.V. was pretextual, and that Defendants retaliated against C.V. by suspending her a second time and then expelling her from school because she and her mother complained about the taunting by C.V.'s peers.

**B.     42 U.S.C. § 1983 Claims**

Plaintiffs also seek relief under 42 U.S.C. § 1983 for alleged violations of C.V.'s constitutional rights. That statute states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. This statute "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3 (1979)).

In order to recover under § 1983, a plaintiff must prove that the defendant, while acting under color of state law, violated rights secured by the Constitution or laws of the United States. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970). Defendants concede that they were acting under color of state law at the time of the events in question. At issue is whether their conduct violated Plaintiffs' rights under the Fourteenth or First Amendments to the United States Constitution.

20

### 1. Fourteenth Amendment Substantive Due Process

The Fourteenth Amendment to the United States Constitution provides, in relevant part, that no State shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause has procedural and substantive components. As the Sixth Circuit explained in Howard v. Grinage, 82 F.3d 1343, 1350 (6th Cir. 1996), "substantive due process prohibits the government's abuse of power or its use for the purpose of oppression, and procedural due process prohibits arbitrary and unfair deprivations of protected life, liberty, or property interests without procedural safeguards." Although Plaintiffs' Amended Complaint does not specify whether Plaintiffs are alleging violations of their substantive or procedural due process rights, their memorandum in opposition to Fenik's motion for summary judgment makes it clear that only substantive due process rights are at issue.

The substantive component of the Due Process Clause protects "fundamental rights otherwise not explicitly protected by the Bill of Rights" and serves "as a limitation on official misconduct which, although not infringing on a fundamental right," is so oppressive that it shocks the conscience. See Howard, 82 F.3d at 1349. Fundamental rights are those specifically guaranteed by the United States Constitution and those rights that are "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325 (1937), overruled on other grounds by Benton v. Maryland, 395 U.S. 784 (1969). These generally include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (internal citations omitted).

Plaintiffs argue that Defendants violated C.V.'s substantive due process rights by: (1) failing to protect her from the verbal taunts of her classmates; and (2) retaliating against her by suspending her and expelling her after she and her mother complained about the sexual harassment. Defendants argue that none of this conduct gives rise to a substantive due process claim. The Court agrees.

### a.        Failure to Protect from Verbal Taunts

Plaintiffs note that the Supreme Court has held that school districts may be held liable for peer-on-peer sexual harassment under Title IX. See Davis, 526 U.S. at 633. Moreover, Plaintiffs are not necessarily barred from pursuing concurrent claims under Title IX and § 1983. See Fitzgerald v. Barnstable Sch. Comm., 129 S.Ct. 788 (2009). However, this does not necessarily mean that peer-on-peer sexual harassment also implicates substantive due process rights as Plaintiffs maintain it does. In support of their claim, Plaintiffs rely on Doe v. Claiborne County Board of Education, 103 F.3d 495 (6th Cir. 1996), in which the Sixth Circuit held that a high school teacher who had sexually abused and statutorily raped one of his students violated that student's substantive due process rights. The court noted that, "[i]f the 'right to bodily integrity' means anything, it certainly encompasses the right not to be sexually assaulted under color of state law." Id. at 506-07.

Doe is factually and legally distinguishable on several important grounds. Whereas a sexual assault clearly implicates the fundamental right to "bodily integrity," verbal taunting does not. Moreover, in Doe, the perpetrator of the sexual harassment was a teacher, a state actor. In contrast, the individuals who allegedly harassed C.V. were students. The Substantive Due Process Clause protects individuals from abuses of *governmental* power. As a general rule, it does not impose a constitutional duty on the school to protect students from harm inflicted by private actors such as their classmates. See DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189 (1989).

Plaintiffs have pointed to no cases in which a court has held that a student's substantive due process rights were violated when the student was subjected to verbal taunting by classmates, and the Court has not been able to find any. See Morgan v. Bend-La Pine Sch. Dist., No. CV-07-173-ST, 2009 WL 312423, at *10, *10 n.25 (D. Or. Feb. 6, 2009) (noting that although the Ninth Circuit has acknowledged a constitutional right to be free from sexual abuse by school employees, it has not recognized a substantive due process claim based on a failure of school officials to prevent student-on-student sexual harassment).

For these reasons, the Court finds that Defendants are entitled to summary judgment as a matter of law on Plaintiffs' claim of a substantive due process violation premised on Defendants' alleged failure to protect C.V. from verbal taunting by her classmates.

### b. Retaliation

Plaintiffs also argue that C.V.'s substantive due process rights were implicated when Defendants allegedly retaliated against her by disciplining her in retaliation for complaining about the sexual harassment. In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court held that where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular kind of governmental behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Id. at 395.

Because the First Amendment specifically protects the right of freedom of speech and the right to petition the Government for a redress of grievances, Plaintiffs' claim of retaliation must be analyzed under the First Amendment rather than the Substantive Due Process Clause of the Fourteenth Amendment. Defendants are, therefore, entitled to summary judgment on this claim also.

### 2.    First Amendment

Plaintiffs also allege that Defendants violated their First Amendment rights by retaliating against them for complaining about the alleged sexual harassment.  Plaintiffs allege that because of their complaints, Defendants failed to take action to protect C.V. from taunting by other students, and then suspended and expelled C.V. on false charges of theft of the iPod.  In order to recover damages for a First Amendment retaliation claim, a plaintiff must demonstrate:

> (1) the plaintiff was engaged in a constitutionally protected activity;
>
> (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and
>
> (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

Jenkins v. Rock Hill Local Sch. Dist., 513 F.3d 580, 585-86 (6th Cir. 2008) (citing Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir.1998)).  "If the plaintiff meets this burden, the burden of production shifts to the defendant, Thaddeus-X v. Blatter, 175 F.3d 378, 399 (6th Cir.1999) (en banc), but if the defendant can show he would have taken the same action in the absence of the protected activity, he is entitled to summary judgment. Id."  Jenkins, 513 F.3d at 586.[9]

### a.    Claim Against Fenik

For purposes of the pending motion, Defendants concede that Plaintiffs engaged in a constitutionally protected activity by contacting Fenik to complain about the alleged sexual harassment.  It also appears to be undisputed that C.V.'s suspension and expulsion were the type of injury that would chill a person of ordinary firmness from continuing to complain.  Defendants

---

[9]  The McDonnell Douglas burden-shifting analysis does not apply to claims of First Amendment retaliation.  See Garvey v. Montgomery, 128 F. App'x 453, 458 (6th Cir. 2005).

argue, however, that Plaintiffs cannot show that the disciplinary actions taken were motivated, at least in part, by Plaintiffs' complaints of sexual harassment. Fenik denies that Plaintiffs complained to him about the alleged sexual harassment. He testified that he suspended C.V. and recommended her expulsion based on her prior involvement in the bus incident and on his belief that she had stolen an iPod belonging to another student. (Fenik Dep. at 205-06; Fenik Aff. ¶¶ 13-14).

As discussed in the context of Plaintiff's Title IX retaliation claim, there is a genuine issue of material fact concerning whether Fenik knew of Plaintiffs' complaints of sexual harassment. If a jury were to find that Plaintiffs did complain to Fenik, there is also sufficient evidence from which a reasonable jury could find that his decision to suspend C.V. and to recommend her expulsion was motivated, at least in part, by those complaints. As noted above, Mrs. Marcum testified that Fenik appeared to be quite irritated by her many phone calls and "smirked" when he told her that he was recommending that C.V. be expelled from school.

Fenik also argues that he is entitled to qualified immunity on this claim. Qualified immunity shields government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As the Sixth Circuit has explained:

> A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established.

Morrison v. Board of Trustees of Green Tp., 583 F.3d 394, 400 (6th Cir. 2009).[10]

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Fenik violated Plaintiffs' First Amendment rights by retaliating against them in response to their complaints about sexual harassment. Moreover, the right to be free from retaliation for speech protected by the First Amendment was clearly established at the time of this incident. See Scott v. Churchill, 377 F.3d 565, 572 (6th Cir. 2004); Crawford-El v. Britton, 523 U.S. 574, 592 (1998). A reasonable school official would have known that such retaliation was unconstitutional. Therefore, Fenik is not entitled to qualified immunity. For these reasons, the Court denies Fenik's motion for summary judgment on the First Amendment retaliation claim.

### b. Claim Against Board of Education

Plaintiffs also allege that the Board of Education should be held liable under § 1983 for violations of Plaintiffs' First Amendment rights. Plaintiffs allege that the Board of Education exhibited a pattern of deliberate indifference by failing to provide proper training and oversight of Fenik and other school personnel with respect to peer-to-peer sexual harassment. They further allege that the Board of Education has failed to establish policies to prevent retaliation against students and parents who report such harassment.

Plaintiffs' claims against the Board of Education are governed by Monell v. Department of Social Services, 436 U.S. 658 (1978). While a governmental entity may be considered a "person" for purposes of § 1983, it cannot be held liable for the acts of its employees on a *respondeat superior* theory. Id. at 691. A governmental entity may be held liable for constitutional violations only if

---

[10] In Pearson v. Callahan, -- U.S. --, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Supreme Court recently held that these two prongs need not be considered in any particular order.

those violations are the result of an official policy or custom.  Id. at 694.  See also City of Canton v. Harris, 489 U.S. 378, 389 (1989)(official policy or custom must be the "moving force" behind the alleged constitutional deprivation).  The existence of an official policy or custom may be proven in several ways.

In City of Canton, the Supreme Court held that a governmental entity may be held liable under § 1983 if its failure to adequately train or supervise employees "amounts to deliberate indifference to the rights of persons with whom the [officials] come into contact."  Id. at 388.  However, in order to establish the requisite "deliberate indifference," a plaintiff must generally show "prior instances of unconstitutional conduct" demonstrating that the school district has ignored a history of problems with peer-to-peer sexual harassment or retaliation and "was clearly on notice that the training in this particular area was deficient and likely to cause injury."  See Miller v. Sanilac County, 606 F.3d 240, 255 (6th Cir. 2010) (quoting Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005)).  As the Supreme Court explained in Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985), "[p]roof of a single incident of unconstitutional activity" is usually insufficient to impose municipal liability unless that incident was caused by an policy which is itself unconstitutional.

In this case, there is simply no evidence that the Board of Education had a policy or custom of tolerating sexual harassment or retaliation based on complaints of sexual harassment.  The Board of Education has a formal policy prohibiting sexual harassment and Mr. Dildine could not recall ever having dealt with prior instances of student-on-student sexual harassment.  (Dildine Dep. at 60, 68).  Plaintiffs have not pointed to any other instance in which school officials in the Bloom-Carroll Local School District failed to take prompt action to respond to complaints of peer-on-peer harassment or retaliated against parents or students who reported such harassment.  Absent any evidence of a

widespread or persistent pattern or practice of constitutional violations, Plaintiffs have failed to present sufficient evidence from which a reasonable jury could find the requisite deliberate indifference. The Board of Education is therefore entitled to summary judgment on Plaintiffs' § 1983 claim of failure to train and supervise.

## IV.    Conclusion

For the reasons set forth above, Fenik's motion for summary judgment (Doc. 36) is **GRANTED IN PART and DENIED IN PART**. Fenik is entitled to summary judgment on Counts 1, 2, and 3 of the Amended Complaint. However, the Court denies the motion for summary judgment with respect to Count 4 of the Amended Complaint, the § 1983 claim of First Amendment retaliation.

The Bloom-Carroll Local School District Board of Education's motion for summary judgment (Doc. 37) is also **GRANTED IN PART and DENIED IN PART**. The Board of Education is entitled to summary judgment on Counts 1, 3, and 4 of the Amended Complaint. However, the Court denies the motion for summary judgment with respect to Count 2 of the Amended Complaint, the Title IX claim of retaliation.

<strong>IT IS SO ORDERED.</strong>

Date: July 23, 2010                                    **/s/ John D. Holschuh**
                                                       John D. Holschuh, Judge
                                                       United States District Court

28